**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

|  |  |
|---|---|
| MICHAEL LEACH, | ) |
| Plaintiff, | ) |
| v. | )     **Case No. 19-cv-947 (APM)** |
| DISTRICT OF COLUMBIA et al., | ) |
| Defendants. | ) |

---

## AMENDED MEMORANDUM OPINION AND ORDER

### I.   INTRODUCTION

On the afternoon of March 22, 2017, officers of the Metropolitan Police Department ("MPD") responded to a call about a shooting in an apartment building. They encountered Plaintiff Michael Leach standing alone on a first-floor landing in front of an open apartment door. Plaintiff had a gun in his right hand. In a rapidly escalating confrontation lasting mere seconds, one officer, John Bewley, shot Plaintiff five times. Another officer—identified only as Officer Doe One—repeatedly struck Plaintiff in the head after he had been shot. Plaintiff survived and filed this action seeking damages for the injuries he sustained.

Plaintiff asserts claims against the District of Columbia, Officer Bewley, and sixteen other MPD officers who were present that day, including two unknown "Officer John Does." Plaintiff also names MPD Chief Robert J. Contee III as a defendant in his official capacity. Specifically, Plaintiff raises three constitutional claims under 42 U.S.C. § 1983: use of excessive force by Officer Bewley and Officer Doe One (Count 1); municipal liability against the District for Officer Bewley's actions (Count 2); and failure to intervene by all Defendant Officers (Count 3). Plaintiff

also raises parallel common law and statutory claims: gross and common-law negligence against Officer Bewley and the District of Columbia (Counts 4 and 5); assault and battery against Officer Bewley, Officer Doe One, and the District of Columbia (Count 6); and negligent training and supervision against the District of Columbia and Chief Contee (Count 7).

All Defendants except the John Doe Officers have moved to dismiss, or in the alternative, for summary judgment. For the reasons below, the court grants Defendants' motion as to all counts. However, the District remains a defendant in this action insofar as it is alleged to be vicariously liable for the acts of Officer Doe One.

## II.   BACKGROUND

### A.   Factual Background

On the afternoon of March 22, 2017, Plaintiff went to visit an acquaintance—referred to in the record only as John Roe—at his apartment at 4363 Barnaby Road, S.E., Washington, D.C. Defs.' Mot. to Dismiss or in the Alternative Mot. for Summ. J., ECF No. 73 [hereinafter Defs.' Mot.], Defs.' Stmt. of Material Facts as to Which There Is No Genuine Issue [hereinafter Defs.' Undisputed Facts], ¶ 1. Plaintiff and Roe listened to music in Roe's truck before Plaintiff went to the apartment to use the bathroom. *Id.* ¶ 2. A second unnamed person with whom Roe shared the apartment came out to the truck and told Roe that Plaintiff had not come out of the bathroom and was not responding or opening the door. *Id.* ¶ 3. Roe returned to the apartment, knocked on the bathroom door, and he too received no response. *Id.* ¶ 4. He then forced open the door. *Id.* Plaintiff was lying in the bathtub, and Roe smelled PCP. *Id.* ¶ 5. Plaintiff pulled out a gun, pointed

it at Roe, and then fired a shot that missed.  *Id.*  Plaintiff eventually would plead guilty to assault with a dangerous weapon for firing at Roe.[1]

Multiple MPD officers arrived on the scene and encountered Plaintiff on the apartment building's first-floor landing in front of an open apartment door.  *Id.* ¶ 7.[2]  Plaintiff was standing with his left side toward the officers, with his right hand out of view.  *Id.* ¶ 9(b).  Upon seeing Plaintiff, Officer Bewley said to him, "What's up?" and then, "What are you doing, bro?"  *Id.* ¶ 9(c).  Plaintiff did not respond.  *Id.*  Officer Bewley then said, "Let me see your hand; put your hand out," while another officer asked, "What's on the other hand?"  *Id.* ¶ 9(d).  Officer Bewley again said, "Put your hand out" and "Bro, put your hand out," while another officer asked, "What's on the other hand?"  *Id.* ¶ 9(e).

When Plaintiff moved closer to the officers, Officer Bewley saw that Plaintiff was holding a gun.  *Id.* ¶ 9(f).  Bewley reached for the gun while shouting, "Drop the fucking gun!  Drop the gun!"  *Id.* ¶ 9(g).  Bewley then fired five shots at Plaintiff in rapid succession, striking him in the stomach, groin, buttocks, and legs.  Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot., ECF No. 80 [hereinafter Pl.'s Opp'n], Pl.'s Counter-Stmt. of Material Facts as to Which There Is a Genuine Issue, ECF No. 80-1 [hereinafter Pl.'s Disputed Facts], at 5–6.  Plaintiff fell to the floor.  The officers took almost a minute to handcuff him.  *Id.* at 6, 8.  During that time, Officer John Doe One punched Plaintiff's head repeatedly, both before and after Bewley secured the gun.  *Id.* at 7–8.

---

[1] The foregoing facts are based on the factual proffer Plaintiff admitted to in connection with his guilty plea.  *See* Defs.' Undisputed Facts ¶¶ 1–5 (citing Defs.' Mot., Ex. 1, ECF No. 73-1).  Here, in his responsive statement of facts, Plaintiff denies that he "fire[d] a shot at Mr. Roe"; instead, he states that "while he fired a shot it was not at Mr. Roe." Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot., ECF No. 80, Pl.'s Counter-Stmt. of Material Facts as to Which There Is a Genuine Issue, ECF No. 80-1, at 2.  The court rejects Plaintiff's attempt to back away from his sworn admission to the facts underlying his guilty plea.

[2] With respect to facts regarding his encounter with the police, Plaintiff uniformly responds that he is "[w]ithout information, absent discovery, to admit or dispute and therefore dispute[s]" Defendants' facts.  Pl.'s Disputed Facts at 4–9.  The court, however, has carefully reviewed the body-worn-camera footage submitted by Defendants, and the factual recitation set forth here is consistent with what appears on that footage.  *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007) (instructing the lower court in the case to view "facts in the light depicted by the videotape").

Plaintiff was hospitalized and, as a result of the shooting, "suffers from physical injuries that necessitate a walking cane."  *Id.* at 9.

### B.    Procedural Background

Plaintiff initially filed this action pro se in March 2019, proceeding against the MPD and an "Officer Clay," whom he believed to be the officer that shot him.  Prisoner Compl., ECF No. 1. The MPD moved for summary judgment on the ground that it was not amenable to suit, and that substituting the District would be futile because body-worn-camera ("BWC") footage of the incident showed that the officers had not used excessive force.  Def.'s Mot. for Summ. J., ECF No. 16.  The court denied the motion under Rule 56(d)(1), following Plaintiff's contention that he could not adequately respond without discovery.  Order, ECF No. 39.  The court substituted the District of Columbia as the proper defendant, *id.* at 3, and appointed counsel, Minute Order, Jan. 5, 2021.[3]

Court-appointed counsel then filed an amended complaint, naming as defendants the District of Columbia; MPD Chief Contee in his official capacity; and sixteen MPD officers in their individual capacities, including Officer Bewley and two John Doe Officers.[4]  First Am. Compl., ECF No. 70 [hereinafter FAC], at 4.  All but the unnamed Doe Defendants moved to dismiss or, in the alternative, for summary judgment.  *See* Defs.' Mot.; Notice Regarding Def. Officer Krishaon Ewing, ECF No. 88 (joining motion); Notice Regarding Def. Artavius Williams, ECF No. 101 (same); Notice Regarding Def. Anthony La Bruno, ECF No. 103 (same).

---

[3] Court-appointed counsel have discharged their work ably, and the court is grateful for their efforts on behalf of Plaintiff.

[4] Plaintiff also named a seventeenth officer, Michael Kasco, as a Defendant but did not ultimately serve him.

## III.    LEGAL STANDARDS

In support of their motion, Defendants offered two copies of BWC footage showing the events at issue.  Because this footage resolves some factual disputes, the court relies on it to make factual determinations, *see supra* n. 2, as to certain counts; therefore, the court treats Defendants' motion in part as one for summary judgment, FED. R. CIV. P. 12(d).  Specifically, the court evaluates Counts 1 and 3 through 6 under the summary-judgment standard.  However, because the BWC footage has little or no bearing on the § 1983 municipal-liability (Count 2) and the negligent-training-and-supervision (Count 7) claims against the District, the court evaluates both of those counts under the motion-to-dismiss standard.  The court briefly reviews both standards below.

### A.    Motion to Dismiss

To withstand a motion to dismiss under Rule 12(b)(6), the court must find that the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "[N]aked assertions devoid of further factual enhancement" are not sufficient to support a complaint. *Id.* (alteration and internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 557).  Factual allegations are not required to be "detailed," but pursuant to the Federal Rules, they must be more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that

the pleader is entitled to relief," and the case can be dismissed. *Id.* at 679 (alteration and internal quotation marks omitted) (citing FED. R. CIV. P. 8(a)(2)).

### B.      Motion for Summary Judgment

Federal Rule of Civil Procedure 56 provides that a court should grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  A material fact is one that is capable of affecting the outcome of the litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record that "it believes demonstrate the absence of a genuine issue of material fact." *Id*. at 323.

Once the moving party has made an adequate showing that a fact cannot be disputed, the burden shifts to the party opposing summary judgment to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted). The nonmoving party may oppose the motion using "any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp.*, 477 U.S. at 324. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.  However, "[t]o defeat a motion for summary judgment, the non-moving party must offer more than mere unsupported allegations or denials." *Dormu v. District of Columbia*, 795 F. Supp. 2d 7, 17 (D.D.C. 2011) (citing *Celotex*, 477 U.S. at 324).  In

other words, if the nonmovant's "evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted). Summary judgment, then, is appropriate when the nonmoving party fails to offer "evidence on which the jury could reasonably find for the [nonmovant]." *Id.* at 252.

## IV.   DISCUSSION

### A.   Threshold Notice Challenge

As a threshold matter, the District argues that Plaintiff's four common law claims (Counts 4–7) should be dismissed for failure to give the District statutory pre-suit notice. Defs.' Mot. at 8. The court finds this challenge meritless.[5]

The District's notice statute requires that claimants seeking money damages for unliquidated damages against the District "give[] notice in writing to the Mayor" within six months of the events at issue. D.C. Code § 12-309(a). "A report in writing by the Metropolitan Police Department" can satisfy this notice requirement so long as it includes the "time, place, cause, and circumstances of the injury or damage." *Id.*; *see also Miller v. Spencer*, 330 A.2d 250, 252 (D.C. 1974).

Plaintiff never filed a formal notice with the Mayor but instead relies on the police report prepared in connection with his arrest for firing a shot at Roe. Pl.'s Opp'n at 5–7 (relying on police report, Defs.' Mot, Ex. 2, ECF No. 73-2 [hereinafter Police Report]). The key question the court must answer in determining if that report provides adequate notice is whether "the District should have anticipated . . . that a complaint by [Plaintiff] would be forthcoming." *Allen v. District of*

---

[5] The D.C. Circuit has intimated in an unpublished decision that compliance with § 12-309 is jurisdictional. *Harris v. Bowser*, 843 F. App'x 328, 330 (D.C. Cir. 2021) (describing § 12-309 as a "jurisdictional requirement"). The D.C. Court of Appeals, on the other hand, has opted not to rule on the issue. *See Jaiyeola v. District of Columbia*, 40 A.3d 356, 362 n.14 (D.C. 2012) (declining to decide whether § 12-309's notice requirement is jurisdictional). In the event the notice requirement is jurisdictional, the court has considered it here first.

*Columbia*, 533 A.2d 1259, 1262 (D.C. 1987). "Because the District of Columbia is not an insurer, a police report must do more than merely report the happening of an event or accident; it must also report—give notice of—any then apparent injury to the person which later forms the basis of a claim." *Miller*, 330 A.2d at 252. This inquiry "must focus on whether the police report[] adequately described *the District's role* in [the claimant's] injuries." *Doe ex rel. Fein v. District of Columbia*, 697 A.2d 23, 27 (D.C. 1997). In *Doe ex rel. Fein*, the police report detailed the time, place, cause, and circumstances of a minor child's injuries, but it neglected to include "the District's alleged failure to intervene and take custody of" the child and remove her from an abusive home. *Id.* Because it was that failure that gave rise to the District's alleged liability, the D.C. Court of Appeals held that the police report did not meet § 12-309's notice requirements. *Id.*

Here, the police report satisfies the notice statute. The report refers repeatedly to the fact that Plaintiff was shot by an MPD officer and then admitted "to a local hospital for treatment." Police Report at 2, 9, 10, 28. The report's medical addendum adds that Plaintiff suffered a nonfatal gunshot wound to his abdomen. *Id.* at 9. And it includes the time, place, cause, and circumstances of Plaintiff's injuries. The report therefore "indicate[s] a basis for potential liability" beyond the run-of-the-mill arrest report. *Allen*, 533 A.2d at 1263. The District should have anticipated Plaintiff's suit.

### B. Fourth Amendment Excessive Use of Force—Officer Bewley (Count One)

Turning to the substance of Plaintiff's claims, Count One seeks to hold Officer Bewley accountable under § 1983 for using excessive force.[6] Officer Bewley invokes qualified immunity in response.

---

[6] Count One also advances a § 1983 claim against the John Doe Officer who repeatedly hit Plaintiff after he was shot. No argument has been advanced on behalf of the John Doe Officer, so the court does not address this aspect of Count One.

1.    *Legal Standard*

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 7 (2021).  The qualified-immunity inquiry can be resolved on either of its two prongs: (1) whether the plaintiff has made out a violation of a constitutional right, or (2) whether the right in question was clearly established at the time of the challenged actions.  *Pearson v. Callahan*, 555 U.S. 223, 227 (2009).  "'Clearly established' means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful."  *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (some internal quotation marks omitted).  Existing precedent must be so obvious that the unconstitutionality of the officer's conduct cannot be reasonably debated.  *Id.*  "This demanding standard protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* (internal quotation marks omitted).

In determining whether a legal right is clearly established, a court must look to "cases of controlling authority in [its] jurisdiction."  *Wilson v. Layne*, 526 U.S. 603, 604 (1999).  If there is no such controlling authority, then a court must determine whether there is "a consensus of cases of persuasive authority."  *Id.*  And in this Circuit, it is the plaintiff's "burden to show that the particular right in question—narrowly described to fit the factual pattern confronting the officers— was clearly established."  *Dukore v. District of Columbia*, 799 F.3d 1137, 1145 (D.C. Cir. 2015) (internal citation omitted).  The plaintiff can accomplish this by identifying "a case that put [the defendant] on notice that his specific conduct was unlawful."  *Rivas-Villegas*, 142 S. Ct. at 8.

In the context of excessive force under the Fourth Amendment, the Supreme Court has required that the violation's clearly established nature be shown with factual specificity.  *Mullenix*

*v. Luna*, 577 U.S. 7, 12 (2015).  "Use of excessive force is an area of the law in which the result depends very much on the facts of each case." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (internal quotation marks omitted).  Law enforcement personnel are therefore "entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue." *Id.* (internal quotation marks omitted).

### 2.    *The Facts in Light of BWC Footage*

Before the court proceeds to analyze Plaintiff's claim, his factual contentions warrant scrutiny.  On summary judgment, courts must view the facts "in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380 (quoting FED. R. CIV. P. 56(c)).  If opposing parties' factual assertions conflict and one side's story "is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* Here, as stated previously, Defendants provided two copies of officers' BWC footage as exhibits to their motion.  *See* Defs.' Mot, Ex. 3, ECF No. 73-3 [hereinafter Barnaby Road Footage]; Defs.' Mot., Ex. 4, ECF No. 73-4 [hereinafter Leach Footage] (both on file with the court).  The court must view the "facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81.

Plaintiff nevertheless claims that the footage "is an incomplete representation of the events that occurred" and it fails to "capture entirely the events described in [his] Complaint." Pl.'s Disputed Facts at 4.  But Plaintiff does not provide a specific, sworn counterfactual proffer.  Nor does he allege the footage "was doctored or altered in any way." *Scott*, 550 U.S. at 378.  The court therefore will not credit Plaintiff's attempt to create a dispute of fact by suggesting that other angles of the video footage or other discovery would support a materially different version of events. *See Lash v. Lemke*, 786 F.3d 1, 4, 6 (D.C. Cir. 2015) (affirming grant of summary judgment on an

excessive-force claim where the district court had relied on video evidence to counter the plaintiff's claimed version of facts); *see also Smith v. United States*, 121 F. Supp. 3d 112, 117–18, 122 (D.D.C. 2015) (relying on videotape evidence to reject the plaintiff's assertion that the police lacked probable cause to arrest him).

Plaintiff advances two primary theories as to how Officer Bewley violated his constitutional rights.  First, Officer Bewley failed to warn him before firing from point-blank range. Pl.'s Opp'n at 15.  Second, even if the initial shot was lawful, the remaining four shots (or some subset thereof) were unconstitutionally excessive.  *Id.* at 14–15, 17.  In support of these theories, Plaintiff contends that he "never threatened the officers." *Id.* at 15; *see also id.* at 2; *id.* at 14 n.12; *id.* at 16.  Though he admits to holding a gun, Plaintiff states he "never wielded [it] at or in [Defendants'] direction."  *Id.* at 25.  And Plaintiff also claims that Officer Bewley fired the fifth and final shot "when Plaintiff was already on the ground writhing in pain."  *Id.* at 15.

The court finds the BWC footage contradicts Plaintiff's factual assertions in three respects. First, the footage shows that Plaintiff presented a threat to the responding officers.  Plaintiff maintained his grip on the gun despite repeated calls for him to first show his right hand and then drop the weapon.  Barnaby Road Footage at 00:13–00:21.  The tone and urgency of the officers' commands convey the immediate danger that they felt they were facing.  Rather than complying, Plaintiff appeared to lunge towards Officer Bewley.  *Id.* at 00:19–00:21.  And when Bewley tried to wrest the gun from Plaintiff, Plaintiff resisted.  *Id.*  It is beyond dispute that Plaintiff presented a mortal danger to Defendant Officers.

Second, the BWC video shows that Officer Bewley offered some semblance of warning before firing.  He approached Plaintiff with his gun already drawn.  Leach Footage at 00:21–00:26. Then, he demanded four times in quick succession that Plaintiff show what was in his right hand.

11

Barnaby Road Footage at 00:13–00:19.  Another unnamed officer issued the same command twice. *Id.*  Plaintiff offered silence in response.  After seeing Plaintiff with a gun, Officer Bewley forcefully told Plaintiff to "drop the fucking gun" and "drop the gun."  *Id.* at 00:19–00:21.  While Bewley did not include an express "or I'll shoot you" ultimatum in these commands, he clearly communicated warnings to which Plaintiff had the opportunity to respond before the shooting.

Finally, Plaintiff was not already on the ground when Officer Bewley fired his final shot. Bewley fired all five shots in a span of two to three seconds. *Id.* at 00:21–00:23. During this time, Plaintiff went from standing to slumping back on the door of the neighboring apartment.  Plaintiff may have been losing his balance and sliding toward the ground at the time Bewley fired the final shot, but he was still upright when the fifth and final shot was fired.  Barnaby Road Footage at 00:22–00:24; *see also* Defs.' Reply to Pl.'s Mem. of P. & A. in Opp'n to Defs.' Mot. to Dismiss or in the Alternative Mot. for Summ. J, ECF No. 86, [hereinafter Defs.' Reply], at 8 n.5.

Based on these indisputable facts, the court examines Plaintiff's theories that Officer Bewley violated his rights when (1) Bewley did not *explicitly* warn Plaintiff that he would shoot him and (2) Bewley continued firing at Plaintiff even as he fell to the floor.  Each of Plaintiff's theories suffers from the same flaw:  Plaintiff has not identified factually comparable controlling precedent from the Supreme Court or this Circuit, or "a consensus of cases of persuasive authority," that would show a clearly established right.  *Wilson*, 526 U.S. at 604.

3.      *Analysis*

a.      <u>Failure-to-warn theory</u>

To support his failure-to-warn theory, Plaintiff cites authority from the Fourth Circuit for the proposition that "a warning must be given even if the interactions are tense and fast-moving."[7] Pl.'s Opp'n at 15 (internal quotation marks omitted) (citing *Hensley ex rel. N.C. v. Price*, 876 F.3d 573, 585 (4th Cir. 2017)).  Plaintiff also cites *Hensley* to argue that denial of qualified immunity is proper where the plaintiff kept his gun pointed at the ground and did not threaten anyone with it.  *Hensley*, 876 F.3d at 582.  Because it is merely one case rather than part of a "consensus," and it comes out of a different Circuit, the Fourth Circuit decision cannot serve as "controlling authority."  *Wilson*, 526 U.S. at 604.

Even if *Hensley* were binding precedent, it does not support a claim that Plaintiff had a clearly established right to a more explicit warning before Officer Bewley used deadly force.  In that case, sheriff's deputies responded to an early-morning domestic-disturbance call at David Hensley's home and parked in his front yard.  *Hensley*, 876 F.3d at 578.  While the deputies remained in their respective cars with a view of the house's porch, Hensley came onto the porch with his two daughters while holding a handgun.  *Id.*  The deputies did not announce their presence or command Hensley to rid himself of the weapon.  *Id.*  They only watched as Hensley physically fought with his daughters and struck the elder one with the gun.  *Id.*  After the assault ended, Hensley walked off the porch and toward the deputies.  *Id.*  Hensley's gun was pointed down at

---

[7] Plaintiff references other cases from the Supreme Court, the Eleventh Circuit, and the District of New Mexico, Pl.'s Opp'n at 15, but each speaks instead about the feasibility of offering a warning, *see, e.g.*, *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985) ("[D]eadly force may be used . . . if, *where feasible*, some warning has been given." (emphasis added)).  Based on these cases, Plaintiff argues, "[i]f deadly force is justified, then prior to using deadly force, some warning must first be provided to the suspect."  Pl.'s Opp'n at 15.  (The Fourth Circuit in *Hensley*, on the other hand, did not expressly limit the warning requirement to where it is feasible.)  However, because Officer Bewley warned Plaintiff multiple times with his gun drawn before firing—first to show his right hand and then to drop the gun—the feasibility of a warning is not genuinely in dispute.

the ground, and he never raised it toward the deputies or made any threats against them.  *Id.*  At no point during these events did Hensley or the deputies acknowledge each other's presence.  *Id.*  "[T]he Deputies never ordered him to stop, to drop the gun or issued *any* type of warning."  *Id.* (emphasis added).  Neither deputy spoke to him at any point.  *Id.*  Yet once Hensley walked into his yard, the deputies got out of their cars and shot and killed him.  *Id.*

The facts here are markedly different.  Officers arrived at 4363 Barnaby Road, S.E., in response to a call about a shooting.  The BWC footage shows them running toward the building immediately upon their arrival, indicating the urgency of the moment.  Upon seeing Plaintiff, Officer Bewley and another officer spoke to Plaintiff as he stood feet away in a small landing area in front of John Roe's apartment.  Officer Bewley and the other officer issued at least eight verbal commands for Plaintiff to show what he was holding and, after seeing the gun, to drop the weapon.  Defs.' Reply at 7.  Plaintiff never responded to any.  And, when Bewley attempted to gain control of the gun, Plaintiff resisted.  Unlike in *Hensley*, where a jury might "conclude that the deputies shot Hensley only because he was holding a gun," *Hensley*, 876 F.3d at 582, Defendants here "were anticipating encountering a suspect with a gun" who had recently shot at someone.  Defs.' Reply at 7.  When they came upon that suspect in a small enclosed space, he refused to show them what he was holding, did not respond to their commands, and did not drop the gun when ordered to do so.  These facts are decidedly different from *Hensley*'s.

> b.  Excessive-firing theory

For his excessive-firing theory, Plaintiff relies primarily on a Tenth Circuit decision to argue that the circumstances of an encounter may shift "within seconds," thereby "eliminating the justification for deadly force."  Pl.'s Opp'n at 15 (quoting *Fancher v. Barrientos*, 723 F.3d 1191, 1200 (10th Cir. 2013)).  Like the Fourth Circuit's decision in *Hensley*, the Tenth Circuit's decision

in *Fancher* does not establish binding precedent in the District of Columbia. But even if it did, it too is factually inapposite.

In *Fancher*, the suspect physically struggled with a deputy and grabbed onto his gun before trying to steal the deputy's vehicle. *Fancher*, 723 F.3d at 1196. The deputy claimed he was concerned for the safety of neighboring residences because the vehicle had a loaded "assault rifle in the front seat of his car." *Id.* at 1194–96. The suspect tried to drive the car, and the deputy shot him in the chest. *Id.* at 1196. He "was sure that he had hit [the suspect] with the initial shot . . . because he saw him slump." *Id.* at 1196–97. The deputy took a few steps away from the car and felt safer. *Id.* at 1197. Nevertheless, he continued to shoot the suspect, firing a total of seven shots across at least two separate intervals. *Id.* The deputy took a break of "five to seven seconds" between shots. *Id.*

That is a far cry from what occurred here. Rather than the mere possibility that the suspect might pick up a gun, as in *Fancher,* Plaintiff here in fact had control of a gun. Officer Bewley fired all five shots in rapid succession in under three seconds. Barnaby Road Footage at 00:21–00:23. If Bewley's first shot was not excessive, "no reasonable jury could find that Plaintiff ceased being a threat in the fraction of time that passed from the first to the fifth shot." Defs.' Reply at 8; *see also Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014) ("[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended.").

*     *     *

In sum, Plaintiff has not demonstrated that a right to be free from excessive force in these specific factual circumstances was "clearly established." Officer Bewley is therefore entitled to qualified immunity. The court grants summary judgment in his favor.

### C.    Assault and Battery—Officer Bewley and the District (Count Six)

For similar reasons, the court grants Officer Bewley and the District's motion for summary judgment on Plaintiff's assault-and-battery claim for Bewley's use of force only.  Under District of Columbia law, police officers have a "qualified privilege to use reasonable force to effect an arrest, provided that the means employed are not in excess of those which the actor reasonably believes to be necessary." *Holder v. District of Columbia*, 700 A.2d 738, 741 (D.C. 1997) (internal quotation marks omitted).  Deadly force is only authorized if the person "actually and reasonably believes" that he or a third person is at risk of death or serious bodily injury. *Id.*; *see also Garner*, 471 U.S. at 11 (setting the same standard in the Fourth Amendment context).

The D.C. Circuit has held that the qualified-privilege "standard is similar to the excessive force standard applied in the Section 1983 context." *Rogala v. District of Columbia*, 161 F.3d 44, 57 (D.C. Cir. 1998).  As in the Fourth Amendment sphere, "the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Etheredge v. District of Columbia*, 635 A.2d 908, 916 (D.C. 1993) (quoting *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)).  The Supreme Court has instructed that reasonableness must be judged according "to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  Because of this similarity, courts' analysis of the qualified privilege mirrors the qualified-immunity inquiry. *See Rogala*, 161 F.3d at 57 (finding the plaintiff did not prove an assault or battery claim "[f]or substantially the reasons discussed" in the excessive force section of the opinion); *Dormu*, 795 F. Supp. 2d at 28 ("The Court reaches [its

16

assault-and-battery] conclusion for the same reasons described above in analyzing Dormu's excessive force claim under § 1983.").

Thus, for the same reasons the court determined that Officer Bewley is entitled to qualified immunity, he is protected by a qualified privilege under District of Columbia law. Officers responding to a shooting encountered Plaintiff at the location of the shooting holding a gun. He refused to show the gun or drop it, and when Officer Bewley attempted to take the gun, Plaintiff resisted. Plaintiff thus posed "an immediate threat to the safety of the officers or others" in the apartment building. *Graham*, 490 U.S. at 396. It is immaterial whether Plaintiff aimed the gun at the officers because "the law does not require officers in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act." *Wallace v. District of Columbia*, 685 F. Supp. 2d 104, 111 (D.D.C. 2010). And as stated previously, if the initial use of deadly force is proper, "the officers need not stop shooting until the threat has ended." *Plumhoff*, 572 U.S. at 777.

The court holds Officer Bewley's use of deadly force to be privileged and therefore grants him and the District summary judgment as to Plaintiff's claim for assault and battery.

### D.    Negligence—Officer Bewley and the District (Counts Four and Five)

The court will also grant summary judgment on Plaintiff's two non-intentional tort claims, gross negligence (Count Four) and negligence (Court Five). In *District of Columbia v. Chinn*, the D.C. Court of Appeals held that where a negligence claim is premised on "the intentional use of force by police officers," it must be (1) "distinctly pled," (2) "based upon at least one factual scenario that presents an aspect of negligence apart from the use of excessive force itself," and (3) "violative of a distinct standard of care." 839 A.2d 701, 711 (D.C. 2003). Otherwise, the negligence action will not be sufficiently distinguishable for the jury from the intentional tort claim. Such an insufficiently distinguishable negligence claim must fail, "as one may not commit

a negligent assault" or battery.  *Id.* at 710.   The court in *Chinn* further said that, while not strictly

necessary, successfully distinct negligence claims often involve "a [separate] act of negligence,"

or "a misperception of fact."  *Id.* at 711.  These misperceptions of fact typically involve a situation

where an officer's version of events diverges from the plaintiff's.  *Id.* at 708–11 (citing *District of*

*Columbia v. Evans*, 644 A.2d 1008) (D.C. 1994) ("The police claimed the decedent was under the

influence of drugs, had a knife, came at them, and was . . . killed in self-defense, . . . Evans claimed

that the officers, despite being told the decedent was an epileptic, shot him while he was standing

in an alley with nothing in his hands.")).

     Here, Plaintiff's negligence claims fail.  Plaintiff contends that his negligence claims are

different than his intentional tort claim of assault and battery because they rest on Officer "Bewley

violat[ing] MPD regulations including regulations related to de-escalation, providing a warning

prior to firing a service weapon—as well as constitutional protections against excessive force."

Pl.'s Opp'n at 24.  That argument, contrary to *Chinn*, conflates his intentional tort claims (violation

of "constitutional protections against excessive force") with his negligence claims (for failure to

warn).  But even if the court were to read the negligence claims as predicated only on a pre-

shooting failure to warn (and not the use of excessive force), the record does not support his

contention.  As already discussed, Officer Bewley and another officer provided Plaintiff with

multiple warnings to show his right hand and to drop the weapon.  Also, although Plaintiff alludes

to "MPD regulations," he identifies no specific regulation that might inform the standard of care.

The court therefore is left to guess as to how Officer Bewley's warnings were deficient.

     Plaintiff cites two D.C. Court of Appeals decisions predating *Chinn* to bolster his argument,

Pl.'s Opp'n at 24, but neither aids his cause.  In *Etheredge*, the D.C. Court of Appeals allowed

distinct judgments for assault and battery and negligence to survive the defendants' motion for

judgment notwithstanding the verdict. *Etheredge*, 635 A.2d at 916. The assault-and-battery claim was that the defendant officer intentionally shot the plaintiff, while the negligence theory was that the officer misperceived the danger posed because, among other things, the plaintiff did not have a gun the officer believed he had, he had discarded a knife from his pocket, and he had turned his back to the officer when he was shot. *Etheredge*, 635 A.2d at 912–13, 917–918. Plaintiff has not asserted any similar "misperception of fact" here. Similarly, in *District of Columbia v. White*, the Court of Appeals found no reversible error where the jury found in the District of Columbia's favor for the intentional torts and for the plaintiff on a negligence theory. 442 A.2d 159, 162–63 (D.C. 1982). There, the intentional-tort theory was that the detective had committed an assault and battery when he shot and killed the decedent while perceiving him to be holding a gun. *Id.* The negligence theory was that the detective was mistaken in perceiving a gun. *Id.* Again in this case, by contrast, Plaintiff does not claim the type of misperception of fact that might give rise to a distinct negligence claim.

The court therefore will grant summary judgment to Officer Bewley and the District on both Counts Four and Five.

### E.      Failure-to-Intervene Claim—All Defendant Officers (Count Three)

Next, the court moves from the claims against Officer Bewley to one seeking to hold all Defendant Officers liable for failing to prevent Plaintiff's injuries. In Count Three, Plaintiff advances a § 1983 claim against all named Defendant Officers for their failure to intervene to prevent both Bewley's additional shots and Officer Doe One's repeated punching of Plaintiff's head after the shooting. The court finds that Defendants are entitled to qualified immunity and will enter summary judgment in their favor.

The analysis again requires both (1) a violation of a right and (2) that the right was clearly established. *Pearson*, 555 U.S. at 227. The Supreme Court has admonished lower courts "not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1153. Any precedent establishing a right must "squarely govern[] the specific facts at issue." *Id.* (internal quotation marks omitted).

To begin, Plaintiff again does not identify a controlling case in this jurisdiction establishing with the requisite specificity that law enforcement officers have a constitutional duty to intervene in circumstances similar to those presented here. Pl.'s Opp'n at 22–23. Instead Plaintiff cites a decades-old decision that arises in the distinguishable context of a *supervisory* officer's liability, where the court expressly observed that the D.C. Circuit had not addressed "the scope of [a police officer's] constitutional duty to protect [a] plaintiff from harm in the context of an observed arrest." *Masel v. Barrett*, 707 F. Supp. 4, 7 (D.D.C. 1989). That said, there appears to be uniformity among the Circuits to have addressed the issue that law enforcement officers have a Fourth Amendment duty to intervene where there is "a realistic opportunity to step forward and prevent a fellow officer from violating a plaintiff's rights through the use of excessive force but fail to do so." *Jackson v. District of Columbia*, 327 F. Supp. 3d 52, 66–67 (D.D.C. 2018) (quoting *Miller v. Smith*, 220 F.3d 491, 495 (7th Cir. 2000), and collecting other Circuit cases). But even if these cases do amount to "a consensus of cases of persuasive authority" establishing such a right, *Wilson*, 526 U.S. at 604, Plaintiff has not cited any authority entitling him to have officers intervene in circumstances similar to those presented here. His sole support to show that the right is "clearly established" is *Masel*, which is both factually distinguishable[8] and defined at too "high [a] level of generality,"

---

[8] In *Masel*, the plaintiff protested at the White House with a banner that violated the "sidewalk sign size regulations." *Masel*, 707 F. Supp. at 6. The U.S. Park Police warned him that he would be arrested, and then he was approached by one officer who grabbed his arm and another who hit him on the back of his head. *Id.* The plaintiff was dragged

*Kisela*, 138 S. Ct. at 1153.  Due to this lack of authority alone, Defendant Officers are entitled to entry of summary judgment.

Plaintiff also cannot succeed on the merits of the claim.  In evaluating the duty to intervene, the court in *Jackson* adopted the Fourth Circuit's bystander-liability test, which holds an officer liable "if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  327 F. Supp. 3d at 67 (citing *Randall v. Prince George's Cnty.*, 302 F.3d 188, 204 (4th Cir. 2002)).  As the court discusses below, Plaintiff does not satisfy these elements as to either of his failure-to-intervene theories.

### 1.    *Intervening to Prevent Officer Bewley's Additional Shots*

The undisputed evidence does not support Plaintiff's theory that officers failed to intervene to prevent additional shots by Officer Bewley.  First, as discussed *supra*, Officer Bewley's use of force did not violate a clearly established constitutional right, such that a reasonable officer would have known to intercede.  *Cf. Matthews v. District of Columbia*, 730 F. Supp. 2d 33, 39 (D.D.C. 2010) (allowing bystander-liability claim to proceed against officers present for a strip search of a suspect).  Second, even if Bewley's use of force did violate Plaintiff's rights, the entire sequence of events occurred so rapidly that no other officer had a meaningful opportunity to intervene.  Officer Bewley encountered Plaintiff no more than 10 seconds before he first fired his gun. Barnaby Road Footage at 00:10–00:21.  Then, Bewley fired five times within three seconds.  *Id.* at 00:21–00:24.  No Defendant officer could have intervened in such a short period of time once the shooting began.

---

"head first over a concrete barrier" and later hit "three or four times in the lower back with a long wooden nightstick." *Id.*  These facts are self-evidently dissimilar.

2.     *Intervening to Prevent Defendant Doe's Head Punches*

As to Plaintiff's theory that Defendant Officers failed to prevent Officer Doe's repeated punching of his head, the court starts with what the BWC footage shows.  After Officer Bewley shot Plaintiff five times, Plaintiff fell to the ground.  Barnaby Road Footage at 00:21–00:26.  For another twelve seconds, Defendants struggled to gain control over Plaintiff's gun.  Leach Footage at 00:36–00:48.  At least four Defendants struck Plaintiff in various places as the struggle over the weapon ensued.  *Id.*  Officer Bewley eventually retrieved the gun.  Barnaby Road Footage at 00:35–00:40.  In the next four seconds, Bewley shouted that he had the gun multiple times.  Leach Footage at 00:48–00:52.  At least two other Defendant Officers echoed Bewley.  *Id.*  After that, a female officer (likely either Defendant Officer Christina Laury or Defendant Officer Andrea White) put her hand on Officer Doe One's shoulder and repeated, "he got it!" three times in quick succession.  *Id.* at 00:52.  But the scene remained chaotic.  Defendants struggled to handcuff Plaintiff.  One Defendant shouted at Plaintiff to stop resisting arrest four times over the next sixteen seconds.  *Id.* at 00:52–1:08.  During this time, Officer Doe One punched Plaintiff at least six times. *Id.*  Finally, a Defendant Officer stated that he had control of one of Plaintiff's hands.  At least three Defendant Officers were on top of Plaintiff, but Defendant Doe One threw another punch as they worked to handcuff him.  *Id.* at 1:29–1:31.

In *Wardlaw v. Pickett*, the plaintiff advanced a *Bivens* claim that a U.S. Marshal had failed to prevent another Marshal from using excessive force in removing him from a courtroom.  The D.C. Circuit rejected the failure-to-intervene claim, observing that "[t]he entire confrontation lasted approximately ten to fifteen seconds," and even if the Marshal "had attempted to intervene, he might not have succeeded in separating [two people] any faster than their own actions and reactions did."  1 F.3d 1297, 1304 (D.C. Cir. 1993).  The incident here lasted approximately the

same amount of time, and it is unclear whether, if any Defendant Officer had intervened, he or she could have prevented the excessive punching.  Though *Wardlaw* arguably does not conclusively foreclose liability for failure to intervene in this case, it raises an important question:  Which of the fourteen named and served Defendant Officers were even in a position to intervene?  It cannot be all of them.  Officer Bewley, for example, in the seconds after the shooting, struggled to obtain the gun and, once he gained control of it, retreated into the nearby apartment.  Barnaby Road Footage at 00:37–00:41.  He had no opportunity to intervene to prevent Officer Doe's punches. This example highlights the problem with Plaintiff's failure-to-intervene claim: though he names each officer individually as a defendant, he treats them as an undifferentiated collective.  The court therefore cannot assess whether any particular Officer Defendant might have failed to intervene. Perhaps discovery would provide further clarity, but given the court's conclusion that all Defendant Officers are entitled to qualified immunity, further inquiry would serve no purpose.

### F.     Section 1983—Municipal Liability (Count Two)

The court turns now to the claims asserted solely against the District.  As stated previously, the court evaluates these claims under the motion-to-dismiss standard.  The first such claim is for municipal liability under § 1983.

Courts conduct a two-part test to determine whether a municipality is liable to a plaintiff for a constitutional violation.  *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). First, the court considers "whether the complaint states a claim for a predicate constitutional violation."  *Id.*  Next, the court evaluates "whether the complaint states a claim that a custom or policy of the municipality caused the violation."  *Id.* (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Plaintiff invokes two of the four ways a municipality can set a "policy" in order for it to be liable under § 1983:  (1) a policymaker can knowingly fail to act to correct

subordinates' actions so consistently as to render them "custom"; or (2) the government can fail to respond to a clear need in such a manner as to demonstrate "deliberate indifference" to the possibility that leaving the need unaddressed will lead to violations of the Constitution. *Baker*, 326 F.3d at 1306; *see also* Pl.'s Opp'n at 18. The court takes these in reverse order.

Deliberate indifference occurs where a municipality "knew or should have known of the risk of constitutional violations but did not act." *Jones v. Horne*, 634 F.3d 588, 601 (D.C. Cir. 2011) (internal quotation marks omitted). The standard for deliberate indifference is "stringent." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). "[M]ere negligence" will not suffice. *Jones*, 634 F.3d at 601. The most common way to make out a "deliberate indifference" claim is to show a pattern of constitutional violations that are similar in nature. *Connick*, 563 U.S. at 62; *Carter v. District of Columbia*, 795 F.2d 116, 123–26 (D.C. Cir. 1986).

Plaintiff attempts to plead such a pattern here, asserting that the District "failed to adequately train, supervise, control, and discipline MPD officers, including Defendant Officers." FAC ¶ 84. He cites generic data about lawsuits, settlements, District budgets, and sustained complaints about MPD officers' use of force. *Id.* ¶¶ 87–91. This includes, for example, seventy-plus lawsuits involving alleged "officer misconduct and officer negligence" leading to over $40 million in settlements. *Id.* ¶ 87. Some of this data postdates the March 2017 incident in question. *See* Defs.' Mot. at 18. But, importantly, none of the data that Plaintiff presents, before or after the incident, is specific to *lethal* uses of force by MPD officers. Plaintiff must allege comparable situational data or examples to make out a plausible deliberate-indifference theory even at the motion-to-dismiss stage. His failure to do so defeats his municipal-liability claim respecting Officer Bewley's lethal use of force. *Cf. Singh v. District of Columbia*, 881 F. Supp. 2d 76, 87 (D.D.C. 2012) (finding the requisite specificity where a plaintiff alleged he was harassed

by the same, small group of MPD officers "on five separate occasions" and "nothing was done to stop, discipline, or investigate the defendant officers"); *Muhammad v. District of Columbia*, 584 F. Supp. 2d 134, 139 (D.D.C. 2008) (allowing a deliberate-indifference theory to move forward where an officer had been the subject of fourteen "other citizens' complaints, thirteen of which were filed before" the plaintiff and the officer had their interaction).

The court rejects Plaintiff's pleading of custom as a basis for municipal liability for much the same reason. To plead such theory, a plaintiff must come forward with facts showing that, as pertinent here, the police force "engaged in a persistent or regular pattern of conduct that gave rise to the alleged constitutional violations." *Egudu v. District of Columbia*, 72 F. Supp. 3d 34, 41 (D.D.C. 2014). Courts have required a plaintiff to plead facially similar past wrongdoing to establish a plausible custom. *See, e.g., id.* at 41–43 (finding no "custom of arresting individuals for disorderly conduct" violative of the First and Fourth Amendments where the plaintiff's evidence included a report about such arrests that was "tailored toward exposing racial disparities" rather than "violati[ng] . . . an individual's free speech rights"); *Hunter v. District of Columbia*, 824 F. Supp. 2d 125, 132–37 (D.D.C. 2011) (finding no custom of "arresting citizens without probable cause" where the plaintiff was arrested for an open container of alcohol but relied on a four-year-old report examining arrests for a different offense); *Matthews*, 730 F. Supp. at 38 (finding a custom of unlawful public strip searches where there were six instances across two years). Again, Plaintiff's data about unspecified "officer misconduct" and facts and figures about the same are simply too generic to plausibly support municipal liability based on custom for Plaintiff's specific excessive use-of-force claim. The court thus dismisses Count Two as to the District's alleged municipal liability for Officer Bewley's lethal use of force.

### G.     Negligent Training and Supervision—District of Columbia (Count Seven)

Finally, Plaintiff fails to state a claim against the District and Chief Contee for negligent training and supervision.  Under this direct theory of negligence, a plaintiff must demonstrate "that an employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or constructive knowledge, failed to adequately supervise the employee." *Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985).  Courts in this District look to whether the District or MPD supervisors were put on "constructive notice of dangerous or incompetent behavior by the officers in question *prior* to" the incident in question.  *Spiller v. District of Columbia*, 302 F. Supp. 3d 240, 255 (D.D.C. 2018).  This may take the form of allegations that the defendant officers had engaged in similar incidents previously, or that supervisors knew of other problematic aspects of their behavior.  *Id.*  A claim for failure to train also may be supported by allegations that the MPD did not discipline or retrain officers after claims of excessive force were substantiated against officers.  *Id.*  Or a plaintiff may demonstrate that incidents of excessive force recur so regularly "that the District was on notice of some common propensity among MPD officers."  *Id.*

Here, Plaintiff sets forth no such allegations.  Instead, he relies on the same data and figures as he used in support of his § 1983 claim.  Pl.'s Opp'n at 27.  Yet Plaintiff does not take the critical next step of "connecting these public reports to Plaintiff's case so as to establish a pattern." *Xingru Lin v. District of Columbia*, No. 16-cv-645 (CKK), 2020 WL 3542253, at *18 (D.D.C. June 30, 2020), *modified on other grounds*, 2020 WL 5816235 (D.D.C. Sept. 30, 2020).  Defendants' motion to dismiss the claim is granted.[9]

---

[9] The court dismisses Chief Contee from the action for the additional reason that Plaintiff has not shown why he should remain a party.  Plaintiff's assertion that Chief Contee has "relevant information" concerning the MPD, Pl.'s Opp'n at 5, does not justify naming him as a party, even if only in his official capacity.

V.      **CONCLUSION AND ORDER**

For the reasons set forth above, the court grants Defendants' motion to dismiss, or in the alternative, motion for summary judgment, ECF No. 73.[10]  The court enters summary judgment in favor of the named Defendants, except Officer Doe One, on Counts One and Three through Six and grants the motion to dismiss on Counts Two and Seven.  The District remains a defendant in this action insofar as it is alleged to be vicarious liability for Officer Doe One's use of excessive force in Counts Two and Six.


Dated:  May 3, 2022                                          Amit P. Mehta
                                                 United States District Court Judge

---

[10] Because the court grants Defendants' motion on other grounds, it need not consider Defendants' statute-of-limitations challenge.  Defs.' Mot. at 10–11.